**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| TB FARMS WELLINGTON, LLC, | ) | CASE NO. 1:22-cv-720 |
|  | ) |  |
| Plaintiff, | ) | JUDGE CHARLES E. FLEMING |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| COLUMBIA GAS TRANSMISSION CO., LLC, | ) |  |
|  | ) | **MEMORANDUM  OPINION  AND** |
| Defendant. | ) | **ORDER** |
|  | ) |  |

Before the Court are two motions: (i) Defendant's motion for summary judgment on all claims asserted against it (ECF No. 35); and (ii) Plaintiff's motion for summary judgment on Counts I, II, III, IV, VI, and VIII (ECF No. 21). The parties have filed their respective briefs in opposition, (ECF Nos. 40, 41), and replies in support, (ECF Nos. 42, 43). For the reasons discussed below, Plaintiff's motion for summary judgment is **DENIED** and Defendant's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

## I.     FACTUAL BACKGROUND

### A.     The Parties and the Property

Plaintiff TB Farms Wellington, LLC ("TB Farms") is a limited liability company whose sole members are Ronald K. Novak and Melissa A. Novak (the "Novaks"). (ECF No. 38, PageID #1084). TB Farms is the owner of certain real property located in the Township of Penfield, Lorain County, Ohio, which include Permanent Parcel Nos. ("PPN") 19-02-030-000-056, 19-03-032-000-002, 19-02-030-000-042, and 19-03-031-000-004 (the "Property"). (ECF Nos. 21-1, 39-2). PPN 19-02-030-000-056 is situated in Tract 2, Lot 30, while PPN 19-03-031-000-004 is located in Tract 3, Lot 31. (ECF No. 35-2, PageID #329; *see* ECF No. 21-1, PageID #210–13). The Novaks

conveyed the Property to TB Farms via quit-claim deed in June 2020.  (ECF No. 21-1, PageID #207).

TB Farms is also the successor-in-interest to a lease agreement for oil and gas rights on the Property that was between H.K. Andrews and Hazel J. Andrews (the "Andrews"), the original lessors, and The Ohio Fuel Gas Company ("Ohio Fuel"), the original lessee.  (*See* ECF No. 39-1, PageID #1331; ECF Nos. 39-2, 39-3, 39-4).  Defendant Columbia Gas Transmission Co., LLC ("Columbia") is the successor-in-interest by merger to Ohio Fuel.  (*See* ECF No. 21, ¶ 13; ECF No. 22, ¶ 13; ECF No. 35-2, PageID #412, 441).

### B.    The Lease Agreement

On April 12, 1950, the Andrews, the title owners of the Property at that time, entered into a lease agreement with "Ohio Fuel" for the oil and gas rights on a portion of the Property (the "Lease"); specifically, Section 2, Lot 30 in the Township of Penfield, Lorain County, Ohio (the "Leasehold").  (ECF Nos. 21-1, 37-2).  The Lease granted Ohio Fuel:

> all the oil and gas in and under the lands hereinafter described, together with the exclusive right to drill for, produce and market oil and gas and also the right to enter thereon at all times for the purpose of drilling and operating for oil, gas and water and to possess, use and occupy so much of said premises as is necessary and convenient in removing the above name products therefrom by pipe lines or otherwise, for a term of twenty (20) years and so much longer thereafter as oil or gas is provided in paying quantity thereon[.]

(ECF No. 21-2, PageID #214; ECF No. 39-3, PageID #1343).

The same day, the Andrews and Ohio Fuel executed a supplemental agreement to the Lease, which was recorded with the Lorain County Recorder's Office on August 14, 1950 ("Supplemental Agreement").  (ECF No. 21-3; ECF No. 39-4).  The Supplemental Agreement provided:

> The privilege of the lessor to take gas from any well on said lands for use on said premises, as and to the extent specified in the original lease, and any modification

2

thereof, shall extend to gas stored or to be stored under said lands as well as to gas produced from such well.

(ECF No. 21-3, PageID #216; ECF No. 39-4, PageID #1346).  The Supplemental Agreement set the primary term of the Lease as 20 years and provided that the term of the Lease would then last "so much longer thereafter as gas is produced, stored in and under said lands or marketed from a well or wells on said land[.]"  (ECF No. 21-3, PageID #216; ECF No. 39-4, PageID #1346).

      **C.**      **Right to Free Gas and the Gas Delivery Agreement**

Under the Lease, the lessor has the right to "lay a line to any gas well on said lands and take gas produced from said well for use for light and heat in one dwelling house on said land, at Lessor's own risk, subject to the use and the right of abandonment of the well by Lessee."  (ECF No. 21-2, PageID #214; ECF No. 39-3, PageID #1343).  Before the Lease, Columbia's predecessor (Ohio Fuel) had drilled Well 7779 on the Leasehold in 1944.  (ECF No. 36, PageID #639–40). The Lease explicitly ratified the existence of Well 7779 and stated that it would be treated the same as if it had "been drilled under this lease."  (ECF No. 39-3, PageID #1343).

In January 2016, the Novaks (owners of the Property at that time) wanted to connect a tap to Well 7779 to utilize the right to free gas under the Lease, transferring the use from the old house at 40378 Jones Road, Wellington, Ohio to a newly built residence at 40300 Jones Road (the "House"), which was built around 2015/2016 and is located within Lot 31.  (*See* ECF No. 35-2, PageID #331, 355; ECF Nos. 37-5, 37-8, 37-9).  On January 18, 2016, Columbia and the Novaks entered into an "Agreement for Delivery of Free Gas and Overburn Gas Provided by Lease" ("Gas Delivery Agreement").  (ECF Nos. 21-9, 39-5).  The Gas Delivery Agreement provided that: (i) the Novaks' right to receive gas was derived solely from the Lease; (ii) the Novaks were entitled to 300,000 cubic feet annually under the Lease; (iii) the service address for the delivery of the free gas was 40300 Jones Road, Wellington, Ohio (the House); and (iv) Well 7779 was the relevant

3

well under the agreement.  (ECF No. 39-5, PageID #1349–50).  The Gas Delivery Agreement also stated: "Any signatory party to this Agreement shall have the right to terminate this Agreement . . . at any time after the interest of another signatory party is transferred whether by assignment of the transferor's interest in the [Lease], by abandonment, or by other operation of law."  (*Id.* at PageID #1350).

### D.    Construction of the Driveway

Before 2015, Columbia had used an access path on the Leasehold that runs north of Jones Road and then turns West to Well 7779 ("Historical Access Path") for maintenance and operations of Well 7779.  (ECF No. 35-2, PageID #604; ECF No. 36, PageID #652; ECF No. 36-5, PageID #758, 770).  In 2015, the Novaks constructed a private driveway that generally travelled alongside the Historical Access Path and intersected with it at two locations ("Driveway").  (ECF No. 35-2, PageID #604; ECF No. 36-5, PageID #758, 770; ECF No. 38, PageID #1121, 1172–74).  After its construction, Columbia used the Driveway to access Well 7779 with no protest by the Novaks. (ECF No. 35-2, PageID #566–67, 604–05; ECF No. 36, PageID #673).

### E.    Authorization and Plugging Operation for Well 7779

In 2021, Columbia requested authorization and blanket certification from the Federal Energy Regulatory Commission ("FERC") to abandon Well 7779, as part of a project to abandon nine wells overall in Lorain and Medina Counties—labeled as the "2021 Wellington Well Abandonments Project."  (ECF No. 36-3).  The Novaks filed a formal protest, objecting to Columbia's plan to use the Driveway as an access road during operations to plug Well 7779.  (ECF No. 35-2, PageID #581).  On June 17, 2021, FERC issued an order denying the Novaks' protest and authorizing Columbia to proceed with the 2021 Wellington Well Abandonments Project under its Part 157 blanket certificate ("FERC Order").  (ECF No. 35-2, PageID #606–07).  The FERC

4

Order noted that "Columbia states that it planned to use the existing access route for the plugging and abandonment of Well No. 7779."  (*Id.* at PageID #605).  On September 24, 2021, Columbia filed a request for alternative measures to facilitate abandonment of Well 7779, wherein Columbia agreed to accommodate the Novaks' request to forgo use of the previously approved "permanent access road" and use a proposed "temporary access road" ("TAR-005") that would be modified to "enter from Jones [R]oad and run adjacent to the private driveway, then continue north-northwest from the intersection of TAR-005 and the private driveway, through the agricultural field, to the existing right-of-way."  (ECF No. 35-2, PageID #518, 527, 530–32).  Columbia installed temporary construction matting along the entire length of the temporary access road during the plugging operations.  (ECF No. 36, PageID #652–63).

In October 2021, Columbia began the process of plugging Well 7779.  (ECF No. 36, PageID #675–76).  Columbia completed plugging operations for Well 7779 in February 2022.  (*Id.* at PageID #679).  Columbia could not complete all restoration work because of winter weather and the ground being frozen and scheduled final reclamation of the Property to take place in August 2022.  (*Id.* at PageID #655–56, 679–80).  In August 2022, Mr. Novak refused to allow Columbia onto the Property to finish the planned restoration work.  (ECF No. 35-4, PageID #626–27; ECF No. 36, PageID #680, 715–16, 724).  Mr. Novak regraded the Driveway in May 2022 and repaired other damages to the land related to the plugging operations in the fall of 2022, using his company Novak's Construction.  (ECF No. 38, PageID #1083, 1169, 1221–22; ECF No. 39-7, PageID #1419)

## II.  PROCEDURAL BACKGROUND

On November 4, 2022, TB Farms filed a first amended complaint against Defendants Columbia and TC Energy Marketing, Inc. ("TC Energy").  (ECF No. 21).  TB Farms generally

alleges that the Lease and Supplemental Agreement have expired/terminated because Defendants no longer produce and/or store gas on the Property and, alternatively, Defendants have breached the Lease, Lease Amendment, and Free Gas Agreement by failing to supply gas and/or oil pursuant to the various agreements.  (*Id.* at PageID #195–202).  TB Farms asserts eight causes of action: (i) a declaratory judgment that "the Lease and Lease Amendment have terminated/expired pursuant to their terms" (Count I); (ii) a declaratory judgment that TB Farms "is entitled to free gas under the terms of the Lease and Lease Amendment" (Count II); (iii) breach of contract—the Lease and Lease Amendment (Count III); (iv) breach of contract—Free Gas Agreement (Count IV); (v) promissory estoppel—Free Gas Agreement (Count V); (vi) breach of contract— "Unauthorized Use of Property/Breach of Quiet Enjoyment" (Count VI); (vii) promissory estoppel—"Driveway" (Count VII); and (viii) trespass (Count VIII).  (*Id.* at PageID #196–204).

On November 18, 2022, Defendants filed an answer to the first amended complaint.  (ECF No. 22).  Previously, Defendants had also filed a single counterclaim against TB Farms, seeking a declaratory judgment that: (i) "the Lease Agreement and Lease Amendment continue to encumber tax parcels 19-02-030-000-056 and 19-022-030-000-042 so long as Columbia stores natural gas beneath them"; (ii) TB Farms "does not have the privilege to use the limited free gas allotment on the dwelling located on tax parcel number 19-03-031-000-004"; and (iii) TB Farms's free gas usage privilege ceased once Columbia abandoned the well on the Property.  (ECF No. 8, PageID #78–79).  On October 4, 2023, TC Energy was dismissed from this action without prejudice pursuant to the parties' joint stipulation of voluntary dismissal.  (ECF Nos. 31, 33).

On May 31, 2024, Columbia filed a motion for summary judgment on all claims alleged against it in the first amended complaint.  (ECF No. 35).  The same day, TB Farms filed a cross-motion for summary judgment, seeking judgment in its favor on Counts I, II, III, IV, VI, and VIII.

(ECF No. 39).  Both parties filed their respective briefs in opposition, (ECF Nos. 40, 41), and their briefs in support, (ECF Nos. 42, 43).

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  The Rule states that the court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine if it is "based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party."  *Henderson v. Walled Lake Consol. Schools*, 469 F.3d 479, 487 (6th Cir. 2006).  A fact is material if "its resolution might affect the outcome of the suit under the governing substantive law."  *Id*.  The moving party bears the burden of showing that no genuine issues of material fact exist.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The court views the facts and draws all reasonable inferences in favor of the non-moving party. *Pittman v. Experian Info. Solutions, Inc*., 901 F.3d 619, 628 (6th Cir. 2018).  Once the moving party satisfies its burden, the burden shifts to the non-moving party to produce evidence that demonstrates that there is a genuine dispute of a material fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986); *Zinn v. United States*, 885 F. Supp. 2d 866, 871 (N.D. Ohio 2012) (citing *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992)).

## IV.    DISCUSSION

The parties' cross-motions for summary judgment raise two main questions that resolve many of the claims in this action.  The first is whether the Lease is still valid or has lapsed because Columbia plugged the sole well on the Property (Well 7779) and no longer produces any gas on the Leasehold.  The second is whether the Gas Delivery Agreement is still valid, such that

Columbia has breached that agreement by failing to provide free gas to the House.  The Court will address these questions first before addressing any remaining issues.

### A.    Validity of the Lease – Counts I and VIII

Columbia argues that the Lease and Supplemental Agreement (collectively, the "Andrews Lease") are still valid and subsisting because the habendum clause of the Supplemental Agreement extends the Andrews Lease for so long "as gas is produced, stored in and under said lands or marketed from a well or wells on said land," and Columbia currently stores gas beneath the Leasehold.  (ECF No. 35-1, PageID #310).  TB Farms argues that the Andrews Lease has expired because Columbia solely uses the Leasehold as a storage field.  (ECF No. 39, PageID #1325–26).  TB Farms acknowledges the Supplemental Agreement's habendum clause, but it argues that the right to store gas was not created in the habendum clause but in Section 2 of the Supplemental Agreement, which does not include the right to merely use the Leasehold as a storage field.  (*Id.*; ECF No. 42, PageID #1585–86).  Columbia responds that TB Farms interpretation of the habendum clause ignores the plain language of the Andrews Lease and renders portions of the agreement meaningless.  (ECF No. 40, PageID #1441–42).

"Interpreting written contract terms, including whether those terms are ambiguous, is a matter of law to be determined by the court." *New Lansing Gardens Hous. Ltd. P'ship v. Columbus Metro. Hous. Auth.*, 46 F.4th 514, 520 (6th Cir. 2022) (citing *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 (6th Cir. 2019)).  "Because Ohio courts presume that the intent of the parties 'reside[s] in the language they choose to use in their agreement,' the court must ascertain and apply the intent of the parties as evidenced by the language in the contract." *Id.* (quoting *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 763 (6th Cir. 2008)) (alteration in original); *see also Beverage Holdings, L.L.C. v. 5701 Lombardo, L.L.C.*, 2019-Ohio-4716, ¶ 13, 159 Ohio

St. 3d 194, 150 N.E.3d 28 (Ohio 2019) ("We seek primarily to give effect to the intent of the parties, and we presume that the intent of the parties is reflected in the plain language of the contract.").  As a result, Ohio courts will generally give common words their ordinary meaning, and technical words their technical meaning, "unless manifest absurdity results or unless some other meaning is clear from the face or overall contents of the agreement."  *Beverage Holdings*, 150 N.E.3d at 32 (citation omitted); *New Lansing Gardens*, 46 F.4th at 520 (quoting *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d at 276).

Ohio courts will apply the plain language of a contract so long as the contract language is not ambiguous.  *See City of St. Marys v. Auglaize Cnty. Bd. of Comm'rs*, 2007-Ohio-5026, 115 Ohio St. 3d 387, 875 N.E.2d 561, 566 (Ohio 2007); *Savedoff*, 524 F.3d at 763.  A contract's language is ambiguous as a matter of law if it is "unclear, indefinite, and reasonably subject to dual interpretations or is of such doubtful meaning that reasonable minds could disagree as to its meaning[.]"  *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d at 276 (quoting *Cadle v. D'Amico*, 2016- Ohio 4747, 66 N.E.3d 1184, 1188 (Ohio Ct. App. 2016)) (internal quotation marks omitted).

The Court agrees with Columbia and finds that the Andrews Lease is still valid and subsisting because Columbia currently stores gas in and under the Leasehold.  The habendum clause of the Supplemental Agreement provides:

> The lessee shall have and hold the rights and interests in said lands, created by said lease and all modifications thereof, including this instrument, for the term of twenty years, commencing on the date of this instrument, and so much longer thereafter as gas is produced, stored in and under said lands or marketed from a well or wells on said land, all subject to lessee's right to surrender the said lease as herein modified, in manner aforementioned.

(ECF No. 37-3, PageID #1042).  As a result, the Andrews Lease had a primary term of 20 years. But the habendum clause also provides a secondary term that extends the lessee's rights under the

Andrews Lease for an indefinite duration, so long as the terms of the secondary term are satisfied. Here, Columbia's rights are extended under the Andrews Lease so long as gas is: "[1] produced, [2] stored in an under said lands, *or* [3] marketed from a well or wells on said land[.]"  (ECF No. 37-3, PageID #1042 (emphasis added)).  Because the habendum clause uses the disjunctive term "or," the Andrews Lease is a valid and subsists so long as the lessee (Columbia) is utilizing gas in any of the three, alternative listed manners.  *See State ex rel. Rear Door Bookstore v. Tenth Dist. Court of Appeals*, 63 Ohio St. 3d 354, 588 N.E.2d 116, 123 (Ohio 1992) ("The Ohio Supreme Court has defined the word 'or' as: '* * * a function word indicating an alternative between different or unlike things. * * *'" (citation omitted)); *Gencorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 821 (6th Cir. 1999); Antonin Scalia & Bryan A. Garner, *Reading Law* § 12 (2012) ("Under the conjunctive/disjunctive canon, and combines items while or creates alternatives. Competent users of the language rarely hesitate over their meaning.").

In their briefs, the parties do not dispute that Columbia is using the Leasehold as a storage field and that gas is currently stored under the Leasehold.  (ECF No. 35-1, PageID #310; ECF No. 39, PageID #1323–25).  Evidence on the record also supports this conclusion, and TB Farms has produced no evidence in opposition.  (ECF No. 22, PageID #243; ECF No. 37, PageID #992, 1028; ECF No. 35-3, ¶ 11; ECF No. 38, PageID #1187).  Because Columbia is currently storing gas under the Leasehold, when applying the plain language of the habendum clause of the Supplemental Agreement, the Court finds that the Andrews Lease is valid and Columbia's rights under the Andrews Lease are still in effect.

The Court finds TB Farms's arguments about Columbia's storage right being created and limited under Section 2 of the Supplemental Agreement unpersuasive.  Section 2 of the Supplemental Agreement provides:

> Lessee shall have the additional right from time to time to inject gas of any kind for storage in and under said lands, to use for such purpose any well or wells now operated thereon, to drill as it may elect, other wells thereon for such purpose, to remove such gas, together with the natural product of such well or wells therefrom, by such means as lessee may choose, and to install and maintain on said lands such additional equipment and to do such other things as may be reasonably necessary and convenient for such purpose.

(ECF No. 37-3, PageID #1042).  TB Farms contends that Columbia's storage rights under the Andrews Lease are limited by the above clause and there is no right to solely use the Leasehold as a storage field.  (ECF No. 39, PageID #1325–26; ECF No. 42, PageID #1585–86).  In Section 2, Columbia is granted the right to "inject gas of any kind for storage in and under said lands."  (ECF No. 37-2, PageID #1042).  The Court finds that this provision implicitly and necessarily grants Columbia the right to use the Leasehold to store gas that it has injected under the Leasehold.  To read the clause otherwise would render other portions of the Andrews Lease meaningless.  Specifically, the habendum clause's provision that the Andrews Lease subsists so long as gas is stored under the Leasehold and the Lease's provision that:

> When the last well producing under this Lease is abandoned, then Lessee, if it elects to hold this lease, shall resume the payment of the land rentals provided for herein and continue the same until a well producing oil and gas in paying quantity shall be drilled or this lease surrendered.

(ECF No. 37-2, PageID #1040).

The latter provision indicates that Columbia may abandon all wells and continue to maintain its rights under the Andrews Lease so long as it resumes the payment of land rentals and does not surrender the lease.  TB Farms does not argue or provide evidence that Columbia has failed to pay land rentals or surrendered the Andrews Lease.  Further supporting the Court's conclusion, courts in the Northern District of Ohio have previously determined that leases for subsurface rights in Ohio were still valid and had not terminated where: (i) Columbia was the lessee; (ii) the relevant leasehold was used solely for storage; and (iii) the relevant lease contained

11

the same supplemental agreement and habendum clause found in this case.  *See, e.g.*, Mem. Op. and Order at 5–8, *Columbia Gas Transmission Corp. v. Zeigler*, No. 1:00-cv-2972 (N.D. Ohio Nov. 29, 2001);  *see also Columbia Gas Transmission Corp. v. Ally*, No. 1:04-cv-1338, 2006 U.S. Dist. LEXIS 60877, at *16–18 (N.D. Ohio Aug. 28, 2006).

Based on the above, the Court finds that the Andrews Lease has not terminated or expired and Columbia's rights under the Andrews Lease are valid and subsisting.  Accordingly, the Court **GRANTS** summary judgment in Columbia's favor on Count I.  In Count VIII, TB Farms asserts a claim for trespass that is partially premised on the theory that Columbia is trespassing by accessing the Leasehold because the Andrews Lease has terminated.  Thus, the Court likewise **GRANTS** summary judgment in Columbia's favor on Count VIII, to the extent that claim is premised on validity of the Andrews Lease.  The remainder of Count VIII survives because it is based on allegations that Columbia has trespassed by entering and damaging portions of the Leasehold without any authorization—*i.e.*, in excess of the rights granted under the Andrews Lease.  (*See* ECF No. 21, PageID #204).

## B.    Plaintiff's Rights to Free Gas under the Agreements – Counts II, III, and IV

Having determined that the Andrews Lease is still valid and subsisting, the Court must now determine whether Columbia has breached the free gas privilege granted in both the Andrews Lease and Gas Delivery Agreement.  For the reasons that follow, the Court finds that it has not.

TB Farms argues that it is entitled to 300,000 cubic feet of free gas per year under the Andrews Lease and Gas Delivery Agreement because this right to free gas survives so long as gas is stored under the Leasehold, and it is undisputed that gas is currently stored there.  (ECF No. 39, PageID #1323–24).  Columbia disagrees that the free gas privilege applies so long as gas is stored under the Leasehold.  It argues that TB Farms's various claims relating to a free gas privilege fail

12

as a matter of law because, to utilize the free gas privilege: (i) there must be a well on the Leasehold

and Columbia abandoned the sole well on the Leasehold; and (ii) TB Farms must use the free gas

for a dwelling on the Leasehold, but it intends to use the free gas for a dwelling outside the

Leasehold.  (ECF No. 35-1, PageID #311–14; ECF No. 40, PageID #1442–44).

     The Court agrees with Columbia.  The Andrews Lease specifically outlines the TB Farms's

right/privilege to free gas under the agreement.  The Lease provides that:

> Lessor may lay a line to any gas well on said lands and take gas produced from said
> well for use for light and heat in one dwelling house on said land, at Lessor's own
> risk, subject to the use and the right of abandonment of the well by Lessee.

(ECF No. 37-2, PageID #1040).  Under the plain language of the Andrews Lease, the lessor's

privilege to free gas is incumbent upon the existence of a well on the Leasehold.  The lessor has

the right to: (i) lay a line to any gas *well* on the Leasehold; and (ii) take gas produced from such

*wells* for use in a dwelling house on the Leasehold.  Moreover, the free gas privilege is subject to

the lessee's right to abandon any gas well, which would also include any well that the lessor might

have chosen to lay a line to and utilize for the free gas privilege.  (ECF No. 21-2, PageID #214;

ECF No. 39-3, PageID #1343).  This is highlighted by the use of the language "at Lessor's own

risk".  (ECF No. 37-2, PageID #1040).

     The Supplemental Agreement expands on the free gas privilege, providing that:

> The privilege of the lessor to take gas from any well on said lands for use on said
> premises, as and to the extent specified in the original lease, and any modification
> thereof, shall extend to gas stored or to be stored under said lands as well as to gas
> produced from such well.

(ECF No. 37-3, PageID #1042).  Nothing in the language of this provision vitiates the requirement

that there must be a well on the Leasehold for the lessor to use the free gas privilege.  The

Supplemental Agreement specifically states that the free gas privilege specified in the Lease was

"to *take gas from any well* on said lands for use on said premise" and expands that privilege to

"gas stored or to be stored under" the Leasehold.  Contrary to TB Farm's arguments, this did not destroy the requirement for a well, it merely extended the free gas privilege from wells that produce gas to non-producing wells that are used for gas storage.  Under TB Farms's reading of the Andrews Lease, it would have the right to take gas that is stored under the Leasehold even if there is no well on the Leasehold.  But this would render much of the agreement's language meaningless; particularly the language that the lessor may lay a line to any gas *well*, may take gas from a *well*, and that the Lessee has the right to abandon any such well.  Besides ignoring the plain meaning of the Andrews Lease, adopting TB Farms's reading would also lead to an absurd result where the lessor would attempt to extract stored gas without any well, or other means to access the stored gas.

Because Columbia abandoned the sole well on the Leasehold, TB Farms currently has no right or privilege to free gas.  Thus, TB Farms is not entitled to a declaratory judgment that it is entitled to free gas under the Andrews Lease, and its claims for breach of contract related to that privilege fail.

TB Farms's claims related to the free gas privilege under the Andrews Lease also fail because TB Farms had been utilizing, and intends to utilize, the free gas privilege for the benefit of a dwelling that is not located on the Leasehold.  The Lease provides that the free gas privilege allows the lessor to take gas from any well "for use for light and heat in one dwelling house on said land."  (ECF No. 37-2, PageID 1040).  Thus, the taking of gas from a well on the Leasehold for use on any dwelling house that is not located on the Leasehold would exceed the scope of the privilege.

Columbia contends that TB Farms did not, and does not intend to, utilize the free gas privilege in a dwelling house that is located on the Leasehold, which specifically entails only

14

Section 2, Lot 30 of Penfield Township, Lorain County. Instead, it asserts that the dwelling house that had utilized the free gas privilege before the plugging of Well 7779, and to which TB Farms raises its instant claims, was the House, which is located on an adjacent plot on Section 3, Lot No. 31—at 40300 Jones Road, Wellington, Ohio. (ECF No. 35-1, PageID #303–04, 313–14). TB Farms concedes that the House is located off the Leasehold.[1] (ECF No. 35-1, PageID #331; ECF No. 42, PageID #1587). Thus, TB Farms's claim that it has the right to use the free gas privilege for the House is wrong because it is outside the privilege granted under the Andrews Lease.

TB Farms argues that the House being located off the Leasehold does not defeat its claims because the parties modified the scope of the free gas privilege to include the House. It argues that there is clear and convincing evidence of this modification based on: (i) the Gas Delivery Agreement unequivocally transferring the free gas privilege to the House; and (ii) the parties' course of performance, with Columbia providing free gas to the House for five years before abandoning Well 7779. (ECF No. 41, PageID #1571; ECF No. 42, PageID #1586–88).[2] Columbia argues that the parties' course of performance cannot serve to modify the Andrews Lease because there is no evidence that Columbia was aware that the House was not on the Leasehold and providing gas to a non-Leasehold dwelling is merely an accommodation that does not obligate Columbia to continue to provide free gas to a dwelling off the Leasehold. (ECF No. 43, PageID #1604–05).

First, the Court is not convinced that the Gas Delivery Agreement modified the scope of the free gas privilege granted in the Andrews Lease. The Gas Delivery Agreement states: "[the

---

[1] Unrefuted record evidence also establishes that the House is not located on the Leasehold. (ECF No. 35-1, PageID #329, 331; ECF No. 38, PageID #1120).
[2] Although most of the support and development of TB Farms's modification argument is found in its reply brief, (ECF No. 42, PageID #1586–88), the Court can properly consider the argument because TB Farms sufficiently raises it in its prior opposition brief, (ECF No. 41, PageID #1571).

Novaks'] right to receive gas is derived solely from [the Lease], and the delivery of gas by [Columbia] to Applicant is not to be construed as recognition of [the Novaks'] right to be supplied with gas under any other condition or circumstances." (ECF No. 21-9, PageID #235). This provision explicitly provides that the Gas Delivery Agreement does not recognize or expand upon the free gas privilege found under the Andrews Lease. The Gas Delivery Agreement is best understood not as a modification of the free gas privilege and the Andrews Lease, but as a specific agreement for Columbia to supply gas from Well 7779 to the House (listed as the service address in the agreement). (*See* ECF Doc. 21-9).

Second, there is no clear and convincing evidence that Columbia intended to modify the scope of the free gas privilege. As argued by Columbia, there is no evidence that it was aware the House was located outside the Leasehold, or that the Novaks intended to expand the scope of the free gas privilege. (ECF No. 43, PageID #1604–05). The Gas Delivery Agreement states that the Novaks "filed an application with [Columbia] for delivery of the gas under the terms of the [Andrews Lease]." (ECF No. 21-9, PageID #235). Nothing suggests that the Novaks wished to expand the free gas privilege and there is no acknowledgment that the House was located outside the Leasehold. The affidavits submitted by the Novaks with their application do not reference an off-Leasehold dwelling, but instead focus on other parties disclaiming any right to the free gas privilege under the Andrews Lease.[3] (*See* ECF No. 35-2, PageID #430–31).

---

[3] TB Farms cites record evidence that "Columbia representatives worked closely with the Novaks to set up the free gas at their residence despite initially asserting that they were not entitled to free gas" as demonstrating that Columbia recognized the Novaks' right to free gas at the House. (ECF No. 41, PageID #1571 n.2). However, the evidence does not demonstrate that Columbia knew the House was located off the Leasehold, merely that its representatives were unconvinced that free gas privilege had been conveyed/transferred to the Novaks and that all other parties had disclaimed the privilege. (*See* ECF No. 37, PageID #1005–06, 1011–12, 1020–22; *see also* ECF No. 35-2, PageID #420–27).

While Columbia did not breach the Andrews Lease, the Court must separately address whether Columbia breached the Gas Delivery Agreement when it ceased to deliver gas to the House in 2021, after abandoning Well 7779. As previously discussed, the existence of a well on the Leasehold was required for the lessor (the Novaks or now TB Farms) to utilize the free gas privilege in the Andrews Lease. Since the contractual obligation to deliver gas to the House was premised on the free gas privilege granted under the Andrews Lease, there was no longer any obligation once the final well on the Leasehold (Well 7779) was abandoned and plugged. Moreover, the Gas Delivery Agreement explicitly provided: "Any signatory party to this Agreement shall have the right to terminate this Agreement . . . at any time after the interest of another signatory party is transferred, whether by assignment of the transferor's interest in the [Andrews Lease], by abandonment, or by other operation of law." (ECF No. 21-9, PageID #236). Thus, Columbia had the right to terminate the Gas Delivery Agreement after the Novaks transferred their interest in the Andrews Lease, at any point without reservation. There is no dispute that the Novaks transferred their interest in the Andrews Lease to TB Farms in May 2020. (ECF No. 21, PageID #195, 207–08). As a result, Columbia had the right to terminate the Gas Delivery Agreement at any time going forward.

The parties agree that Columbia unilaterally terminated the Gas Delivery Agreement in October 2021 when it commenced operations to plug Well 7779. (ECF No. 35-1, PageID #314–15; ECF No. 41, PageID #1572; ECF No. 43, PageID #1606–07). TB Farms argues that Columbia was not permitted to terminate the Gas Delivery Agreement when it commenced plugging operations because it did not exercise its discretion to terminate the agreement immediately after the Novaks transferred their interest in the Leasehold to TB Farms, continuing to supply free gas to the House from May 18, 2020 (the date of conveyance/transfer) to October 2021. (ECF No. 41,

PageID #1572).  The Court finds this argument unpersuasive.  First, there is no qualification to Columbia's right to terminate the Gas Delivery Agreement and no requirement that it exercise its right to terminate immediately after the Novaks transferred their interest in the Leasehold.  Second, the record demonstrates that the Novaks and TB Farms never informed Columbia that the Novaks had transferred their interest in the Leasehold.  (ECF No. 35-2, PageID #1208–10).  Thus, the Court finds that Columbia did not breach the Gas Delivery Agreement when it failed to provide free gas after October 2021 because Columbia exercised its contractual right to terminate the agreement.

In summation, there is no breach of the Andrews Lease for failure to provide free gas to the House, nor does TB Farms have a current entitlement to free gas, because there is no longer a well on the Leasehold and TB Farms was utilizing the privilege for a non-Leasehold dwelling.  There is also no breach of the Gas Delivery Agreement because there is currently no entitlement to free gas and Columbia exercised its right to terminate the agreement.  Accordingly, the Court **GRANTS** summary judgment in Columbia's favor on Counts II, III, and IV.

### C.  Promissory Estoppel – Free Gas (Count V)

In Count V, TB Farms asserts that Columbia is liable for promissory estoppel because: (i) Columbia made representations and promises to TB Farms's predecessors (the Novaks) about their entitlement to free gas under the Andrews Lease before the parties entered into the Gas Delivery Agreement; (ii) the Novaks and TB Farms relied on those promises and representations to forgo alternative sources of energy; and (iii) TB Farms is now injured due to having no alternative source of energy after Columbia ceased providing free gas.  (ECF No. 21, ¶¶ 57–60).  The Court finds that this claim fails as a matter of law.

18

Under Ohio law, a claim of promissory estoppel requires the plaintiff to demonstrate: "[1] a promise, clear and unambiguous in its terms; [2] reliance [on the promise] by the party to whom the promise is made; [3] that the reliance was reasonable and foreseeable; and [4] that the party claiming estoppel was injured by the reliance." *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 503 (6th Cir. 2003) (quoting *Rigby v. Fallsway Equip. Co., Inc.*, 150 Ohio App. 3d 155, 2002 Ohio 6120, 779 N.E.2d 1056, 1061 (Ohio Ct. App. 2002)); *see Bluegrass Ctr. v. United States Intec, Inc.*, 49 Fed. Appx. 25, 31–32 (6th Cir. 2002) (citing *Weiper v. W.A. Hill & Assocs.*, 104 Ohio App. 3d 250, 661 N.E.2d 796, 803 (Ohio Ct. App. 1995)).  TB Farms has not established all the elements for sustaining its promissory estoppel claim.  TB Farms asserts that it has been injured because Columbia stopped providing free gas to the House after it plugged the last well on the Leasehold.  As discussed above, under the Andrews Lease and Gas Delivery Agreement, the free gas privilege was incumbent upon the existence of a well on the Leasehold and Columbia had the right to terminate the Gas Delivery Agreement after the Novaks transferred the Leasehold to TB Farms.  TB Farms has failed to provide evidence that Columbia made any clear and unambiguous promise or representation that it was obligated to continually provide the Novaks and their successors (TB Farms) with free gas, even when there was no well on the Leasehold.  Nor do the pleadings identify such a promise.

In its opposition brief, TB Farms states that Columbia "represented that Plaintiff's Property was entitled to free gas", but it does not cite to record evidence of these representations or further clarify what the exact representations were.  (ECF No. 41, PageID #1576).  Nowhere in TB Farms's briefs, nor the amended complaint, is any such explanation or identification provided. Reviewing the record, the Court finds no evidence of a promise/representation obligating

19

Columbia to continue providing free gas to the House regardless of whether the terms of the Andrews Lease were satisfied.  Thus, TB Farms's cannot sustain its claim for promissory estoppel.

Even if TB Farms could identify promises to amend the scope of the free gas privilege, its promissory estoppel claim would still fail as a matter of law because the alleged representations were made before the execution of the Gas Delivery Agreement.  Ohio courts have consistently held that "promissory estoppel does not apply to oral statements made prior to the written contract where the contract covers the same subject matter."  *See Casale v. Nationwide Child's Hosp.*, 682 Fed. Appx. 359, 367 (6th Cir. 2017) (quoting *Clark v. Collins Bus Corp.*, 136 Ohio App. 3d 448, 453, 736 N.E.2d 970, 974 (Ohio Ct. App. 2000)); *Borowski v. State Chem. Mfg. Co.*, 97 Ohio App. 3d 635, 647 N.E.2d 230, 235 (Ohio Ct. pp. 1994); *see also Woods v. Capital Univ.*, 2009 Ohio 5672, ¶ 67, 2009 Ohio App. LEXIS 4770, at *45–46 (Ohio Ct. App. 2009) (collecting cases); *Cuthbert v. Trucklease Corp.*, 2004 Ohio 4417, ¶ 30, 2004 Ohio App. LEXIS 4006, at *17–18 (Ohio Ct. App. 2004) (holding that when there is "an unambiguous, written agreement purporting to delineate the obligations of both parties . . . such agreement precludes the use of promissory estoppel to add any oral terms").  "Where a written agreement exists, promissory estoppel is not a vehicle for enforcing alleged oral agreements that contradict the terms of the written agreement." *Skyway Grp., Inc. v. GE Honda Aero Engines LLC*, No. 1:21-cv-51, 2021 U.S. Dist. LEXIS 237979, at *10 (S.D. Ohio Dec. 13, 2021) (citing *Ed Schory & Sons v. Francis*, 75 Ohio St. 3d 433, 1996-Ohio-194, 662 N.E.2d 1074, 1080 (Ohio 1996)).

TB Farms seeks to enforce alleged extrinsic representations that Columbia made regarding the free gas privilege, a subject matter that is covered in the subsequently executed Gas Delivery

Agreement.  Thus, TB Farms cannot sustain its claim for promissory estoppel.[4]  Accordingly, the

Court **GRANTS** summary judgment in Columbia's favor on Count V.

      **D.**      **Breach of Contract – Implied Covenant to Restore the Surface and Breach of Covenant of Quiet Enjoyment (Count VI)**

          *1.*      *Implied Covenant to Restore the Surface Claim – Count VI*

To begin, the Court must determine whether TB Farms properly asserted a breach of contract claim based on a breach of the implied covenant to restore the surface.  In the first amended complaint, Count VI is labeled as "BREACH OF CONTRACT (Unauthorized Use of Property/Breach of Quiet Enjoyment)."  (ECF No. 21, PageID #202).  In this count, TB Farms alleges that Columbia breached the terms of the Andrews Lease by: (i) accessing and traversing over portions of the Leasehold that they were not granted permission to access under the lease; and (ii) traversing over and causing damage to the Leasehold in a manner that unreasonably interfered with TB Farms's right of quite enjoyment.  (*Id.* ¶ 65).

In its motion for summary judgment, TB Farms argues that it is entitled to summary judgment on Count VI because Columbia breached the implied covenant to restore the surface when it damaged the Leasehold and then failed to repair and restore the Leasehold to its original condition.  (ECF No. 39, PageID #1327–28).  Columbia responds that TB Farms did not allege a contractual failure to restore claim; it only raised claims for breach of covenant of quiet enjoyment and/or unauthorized access and trespass.  (ECF No. 40, PageID #1447).  TB Farms replies that it was not obligated to specifically plead a claim for breach of the implied covenant to restore because

---

[4] Count V is also barred by the statute of frauds to the extent that TB Farms intended to argue that the alleged promises concerning the free gas privilege constituted a modification of the privilege granted under the Andrews Lease.  The Andrews Lease is undisputedly a contract the created an interest in land.  Under the statute of frauds, a contract creating an interest in land can be modified only if the modification itself also conforms with the statute of frauds.  *See Vieland v. Commodore Realty Assocs.*, 1996 Ohio App. LEXIS 4559, *8–9 (Ohio Ct. App. 1996); *Bahner's Auto Parts v. Bahner*, 1998 Ohio App. LEXIS 3453, *28 (Ohio Ct. App. 1998); *see also Sutherland v. Fox*, 2005-Ohio-1786, ¶¶ 23–25 (Ohio App. 2005) ("Under R.C. 1335.04 and 1335.05, any modifications to the original oil and gas lease agreement must be in writing.").

that claim was subsumed in the breach of contract claim asserted in Count VI.  (ECF No. 42, PageID #1581).

While the Court agrees that there is no stand-alone claim for "breach of the implied covenant to restore," the issue here is that TB Farms is attempting to raise a new theory of liability for the first time in its motion for summary judgment and expand its breach of contract claim.  The Sixth Circuit has consistently held that parties may not expand their claims and assert new theories at summary judgment.  *See, e.g.*, *Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 496 (6th Cir. 2019); *Alexander v. Carter*, 733 F. App'x 256, 265 (6th Cir. 2018); *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 665–66 (6th Cir. 2012) (holding that a plaintiff is not "entitled to liberal construction of [its] complaint to include new theory raised for first time at summary judgment stage"); *Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) (citing *Harvey v. Great Seneca Fin. Corp.*, 453 F.3d 324, 329 (6th Cir. 2006)); *Tucker v. Union of Needletrades, Indust. & Textile Employees*, 407 F.3d 784, 787–89 (6th Cir. 2005).; *Mich. Bell Tel. Co. v. Strand*, 305 F.3d 580, 589–90 (6th Cir. 2002); *Priddy v. Edelman*, 883 F.2d 438, 446 (6th Cir. 1989).  "Parties who seek to raise new claims at the summary-judgment stage must first move to amend their pleadings under Federal Rule of Civil Procedure 15(a) before asserting the claims in summary-judgment briefing."  *Davis*, 945 F.3d at 496 (citations omitted).

Here, the pleadings for Count VI set forth factual allegations for a breach of contract claim based on two theories of liability: (i) Columbia accessing portions of the Leasehold that exceed the permission granted under the Andrews Lease (*i.e.*, exceeding the scope of the easement granted to Columbia); and (ii) Columbia using the Leasehold in a manner that violated TB Farm's right of quiet enjoyment.  Count VI is also explicitly labeled as a breach of contract claim asserting these two theories of liability.  Nowhere in Count VI, or the remainder of the pleadings, is there a single

22

mention of the implied covenant to restore the surface or an assertion that Columbia was liable for breach of contract for failing to repair damage to the surface of the Leasehold.[5]  There are simply no allegations, supporting facts, or references to the implied covenant to restore the surface that put Columbia on sufficient notice of such a claim.  The first mention of the implied covenant to restore the surface and TB Farms's first time asserting that there was a breach of contract related to violating this implied covenant was in TB Farms's motion for summary judgment.  Because TB Farms did not first move to amend the pleadings to assert a new theory of liability in Count VI, the Court will dismiss any claim for breach of contract based on the implied covenant to restore the surface.

Alternatively, the Court would deny any such claim on the merits.  TB Farms contends that the Andrews Lease contains an implied covenant to restore the surface and that such an implied covenant is "one of the most commonly recognized implied covenants in an oil and gas lease." (ECF No. 39, PageID #1327).  First, the implied covenant to restore the surface is not commonly recognized, let alone *one of the most* commonly recognized implied covenants.  TB Farms cites two cases for support of its contention: *Rudolph v. Viking Int'l Res. Co.*, 2017-Ohio-7369, 84 N.E.3d 1066 (Ohio Ct. App. 2017); and *Yoder v. Artex Oil Co.*, 2014-Ohio-5130 (Ohio Ct. App. 2014).  (ECF No. 39, PageID #1327).  But the Court was able to find only one other Ohio case that mentioned the implied covenant to restore the surface.  *See Alford v. Collins-McGregor Operating Co.*, 2016-Ohio-5082, ¶ 15 (Ohio Ct. App. 2016).  Moreover, the mention of the implied covenant in these cases can be characterized as mere dicta.

---

[5] The only mention of Columbia's failure to repair damage to the Leasehold caused by Columbia's actions were in separate claims for promissory estoppel (Count VII) and trespass (Count VIII).  (ECF No. 21, PageID #203–04, ¶¶ 74, 78).

A district court in the Southern District of Ohio recently addressed this same issue,

conducted an extensive analysis, and similarly noted the lack of Ohio cases recognizing an implied

covenant to restore the surface, determining that the general view is that such an implied covenant

does not exist:

> [T]he Court's research found just three Ohio cases which mention the implied
> covenant to restore.  *See Rudolph v. Viking Int'l Res. Co.*, 2017-Ohio-7369, ¶ 74,
> 84 N.E.3d 1066, 1085–86 (Ohio Ct. App.); *Yoder v. Artex Oil Co.*, 2014-Ohio-
> 5130, ¶ 45 (Ohio Ct. App.); *Alford v. Collins-McGregor Operating Co.*, 2016-
> Ohio-5082, ¶ 15 (Ohio Ct. App.).  None of the three cases addressed the substance
> of such a claim.  In *Randolph*, a lessee to an oil and gas lease abandoned a well
> without plugging it.  The lessor sued for breach of an implied covenant to restore,
> asserting that defendant had an implied duty to plug the well.  Without discussing
> the nature of the claim or the standards imposed, the Ohio appellate court held that
> the lower court had improperly dismissed the claim as time-barred.  *See Rudolph*,
> 2017-Ohio-7369, ¶ 74.  In both *Yoder* and *Alford*, the courts cited an energy
> industry article in stating that implied covenants have been recognized
> in oil and gas leases.  *See Yoder.*, 2014-Ohio-5130, ¶ 45 (citing Keith B. Hall, *The
> Application of Oil & Gas Lease Implied Covenants in Shale Plays: Old Meets New*,
> 32 Energy & Min. L. Inst. 304 (2011)); *Alford*, 2016-Ohio-5082, ¶ 15 (same).  The
> courts then listed examples of potential implied covenants, including a duty to
> restore the surface, but they did not otherwise explain or discuss the implied
> covenant to restore the surface because such a claim was not at issue.
>
> Looking outside Ohio case law, the Court notes the general view is that an implied
> covenant to restore the surface estate does not exist in oil and gas leases.  *See* 62
> A.L.R.4th 1153, § 8.  Indeed, the author of the energy industry article cited
> in *Yoder* and *Alford* states that the "implied duty of surface restoration is not widely
> recognized in jurisprudence."  *See* Keith B. Hall, *The Application of Oil & Gas
> Lease Implied Covenants in Shale Plays: Old Meets New*, p. 8, https://emlf.org/wp-
> content/uploads/2016/06/Min.Law_Sample-Outline.Hall_.pdf (citing a lone case
> which recognized the covenant).  Protection for landowners instead comes in one
> of several forms: negotiating an express right to land restoration in the lease;
> claiming that the lessee's conduct was not a necessary operation, such that it
> violated the clause commonly found in oil and gas leases that the lessee's use of
> the land is limited to that which is necessary and convenient to carry out the lease's
> purposes; or asserting that the lessee's conduct violated a body of statutory or
> regulatory requirements which have been developed to protect landowners.  *See* 62
> A.L.R.4th 1153, §§ 8, 10, 12.

*Reed v. Columbia Gas Transmission, LLC*, No. 2:22-cv-3417, 2025 U.S. Dist. LEXIS 97839, at

*28–31 (S.D. Ohio May 22, 2025).  The Court finds this analysis persuasive and similarly finds

that there is no implied covenant to restore the surface currently recognized under Ohio law. Columbia is entitled to summary judgment on Count VI to the extent it asserts a claim based on breach of the implied covenant to restore the surface.

### 2. *Breach of the Covenant of Quiet Enjoyment*

Turning to the claims actually asserted in Count VI, Columbia argues that TB Farms's claim for breach of quiet enjoyment fails as a matter of law because such a claim is available only when a landlord (TB Farms) evicts a lessee (Columbia) and takes away the lessee's right to quiet enjoyment.  (ECF No. 35-1, PageID #316–17).  TB Farms does not address Columbia's arguments about breach of quiet enjoyment in its opposition brief, motion for summary judgment, or reply brief.  Because TB Farms offered no opposition in response to Columbia's arguments for dismissal of the claim based on a breach of the right to quiet enjoyment, TB Farms has abandoned this claim and waived any argument in opposition to dismissal.  *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.") (collecting cases); *Santo's Italian Café LLC v. Acuity Ins.*, 508 F. Supp. 3d 186, 207 (N.D. Ohio 2020) ("It is well understood . . . that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."); *McNamara v. GM, LLC*, 189 F. Supp. 3d 685, 699–700 (N.D. Ohio 2016) ("Because Plaintiff failed to meet his burden in opposing summary judgment on his harassment claim, Plaintiff has abandoned this claim and waived any argument concerning dismissal of such claim.").  As a result, Columbia is entitled to summary judgment on Count VI as to the claim of breach of quiet enjoyment.[6]

---

[6] Alternatively, this theory of liability for breach of contract fails on the merits.  Under Ohio law, the covenant to quiet enjoyment is a covenant that protects a *tenant's* right to a peaceful and undisturbed enjoyment of the leasehold that is

E.      **Unauthorized Use of the Property – Breach of Contract and Trespass Claims (Counts VI and VIII)**

The remaining claim for breach of contract in Count VI is based on unauthorized use of the property.  TB Farms argues that Columbia exceeded the scope of its license to use the Leasehold when it commenced plugging operations on the Leasehold between 2021 and 2022 because, without permission or authorization, it utilized the Driveway and established a staging area outside the traditional easement area.  (ECF No. 39, PageID #1320–21, 1327; ECF No. 41, PageID #1574).  Columbia argues that this claim fails as a matter of law because it had the right to utilize the surface estate to plug and abandon Well 7779 under the Andrews Lease; it also asserts TB Farms has failed to provide evidence to establish that Columbia's actions on the Leasehold were not privileged or exceeded the scope of the Andrews Lease.  (ECF No. 35-1, PageID #315–17; ECF No. 43, PageID #1608).  Columbia also contends that the claim fails because it used the Leasehold to plug the well in accordance with a plan approved by FERC and FERC has exclusive jurisdiction to determine whether Columbia complied with that authorization.  (ECF No. 35-1, PageID #315–17; ECF No. 40, PageID #1448–49).

The Court notes that resolving the instant claim for breach of contract will also resolve the remaining portion of TB Farm's claim for trespass in Count VIII, as both claims assert that Columbia is liable for damages based on the same tortious conduct: entering and using portions of the Leasehold without authorization during operations to plug Well 7779.  (*Compare*, ECF No. 21, ¶ 78, *with id.* ¶ 65).  Under Ohio law, "[a] common-law tort in trespass upon real property occurs

---

breached only when a *landlord* substantial interferes with that right in a manner that amounts to an actual or constructive eviction. *Neyer Holding II Inc. v. Qiao Yun Huang*, 2025-Ohio-1776, ¶ 89 (Ohio Ct. App. 2025); *Sherritt v. Leath*, 2022-Ohio-2367, ¶ 58 (Ohio Ct. App. 2022); T*elecom Acquisition Corp. I v. Lucic Enters.*, 2016-Ohio-1466, ¶ 15, 62 N.E.3d 1034, 1042 (Ohio Ct. App. 2016); *Howard v. Simon*, 18 Ohio App.3d 14, 18 Ohio B. 38, 480 N.E.2d 99 (Ohio Ct. App. 1984).  TB Farms's claim fails because it does not apply to the circumstances in this case.  Columbia is not a landlord and is more appropriately viewed as the tenant, as it is the party leasing a property interest in the Leasehold; and it has not evicted TB Farms from the Leasehold.

when a person, without authority or privilege, physically invades or unlawfully enters the private premises of another whereby damages directly ensue." *Apel v. Katz*, 83 Ohio St. 3d 11, 1998-Ohio-420, 697 N.E.2d 600, 607 (Ohio 1998). Thus, if Columbia did not exceed the scope of privilege and authorization provided under the Andrews Lease (by entering the portions of the Leasehold, including the Driveway, during plugging operations for Well 7779), then it would not be liable for trespass under the theory asserted by TB Farms. As a result, the Court will address these two claims together.

Under Ohio law, an oil and gas lease grants the lessee, in this case Columbia, "a vested right to the possession of the land to the extent reasonably necessary to perform the terms of the instrument on his part." *French v. Ascent Res.-Utica, L.L.C.*, 2022-Ohio-869, ¶ 16, 167 Ohio St. 3d 398, 193 N.E.3d 543 (Ohio 2022) (quoting *Harris v. Ohio Oil Co.*, 57 Ohio St. 118, 129–30, 48 N.E. 502, 506 (1897)) (cleaned up). In other words, "the lessee also enjoys reasonable use of the surface estate to accomplish the purposes of the lease." *Id.* (quoting *Chesapeake Expl., L.L.C. v. Buell*, 2015-Ohio-4551, ¶ 60, 144 Ohio St. 3d 490, 45 N.E.3d 185 (Ohio 2015)) (internal quotation marks omitted). Thus, under its plain terms, the Andrews Lease grants Columbia the right to enter, possess, use, and occupy portions of the Leasehold to the extent that it is reasonable, necessary, and convenient for operations authorized under the Andrews Lease, which would include drilling for and storing gas, as well as building and abandoning wells.[7] (ECF No. 37-2, PageID #1040; ECF No. 37-3, PageID #1042).

For the instant unauthorized use claims (breach of contract and trespass), TB Farms contends that Columbia, without privilege or authorization, used the Driveway, which was outside the "designated access road," and established a staging area "outside its easement area" during

---

[7] Columbia makes this contention in its merits and opposition briefs, (ECF No. 35-1, PageID #316; ECF No. 40, PageID #1448), and TB Farms provides no statement or argument in opposition.

plugging operations, which resulted in damage to the Leasehold.  (*See* ECF No. 21, PageID #202, 204; ECF No. 39, PageID #1320, 1327; ECF No. 42, PageID #1590).  Thus, for TB Farms to prevail on its unauthorized claims, it must demonstrate that: (i) Columbia used the Driveway and set up a staging area outside the easement area during plugging operations; (ii) this use of the Driveway and the staging area was not reasonably necessary to effectuate the plugging and abandonment of Well 7779; and (iii) there was no other authorization to undertake those actions.

### 1.    Merits of Unauthorized Use Claim

Columbia argues that it is entitled to summary judgment in its favor on the unauthorized use claims because it had "the right to utilize the surface estate to plug and abandon the well" under the Andrews Lease and the activities undertaken for that purpose were done pursuant to plans approved by FERC.  (ECF No. 35-1, PageID #317).  By contrast, TB Farms maintains that it is entitled to summary judgment in its favor because Columbia staged and operated equipment outside of authorized areas during the plugging operations.  (ECF No. 39, PageID #1327; ECF No. 41, PageID #1574).  Although TB Farms does not explicitly refer to the FERC authorized plan, the Court construes its arguments as challenging Columbia's assertion that all plugging activities were done pursuant to the FERC approved plan—*i.e.*, the use of the Driveway and the location of the staging area were outside the approved plan.  If Columbia had performed all plugging operations within the scope of the FERC authorized plan, this would appear to resolve the claims in its favor; there would have been authorization to enter those portions of the Leasehold (defeating any claim of trespass) and following the FERC authorized plan would almost certainly qualify as a reasonable and necessary use of the surface (defeating any breach of contract claim based on unauthorized use).  Notably, neither party presents any arguments addressing whether

28

any actions that might have been outside the scope of the FERC authorized plan were otherwise reasonable for purposes of the plugging operations.

As an initial matter, there appears to be an issue of material fact as to whether Columbia undertook actions outside the scope of the FERC authorized plan.  To establish that there was no unauthorized use of the Driveway, Columbia states that it limited its plugging operations to "its FERC approved route and Mr. Novak's permission", citing deposition testimony from Jason Kendall, a representative of Columbia.  (ECF No. 35-1, PageID #308; ECF No. 40, PageID #1452 n.2).  Mr. Kendall testified that: (i) Mr. Novak granted permission "for a pickup to be off the side of the driveway if we had semitrucks coming in and out to make room", (ECF No. 36, PageID #710); and (ii) Columbia confined its plugging activities to matted areas along the temporary access road, save for trucks occasionally slipping off during icy conditions and trucks moving onto the Driveway to let semitrucks past, (*id.* at PageID #659–61; 695–66, 708, 730–31).

For evidence of unauthorized use of the Driveway, TB Farms cites: (i) its own interrogatory responses, (ECF No. 39-7, PageID #1401); (ii) an estimate and two invoices related to Driveway damages, (ECF No. 39-1, PageID #1333; ECF No. 39-7, PageID #1418–19, 1426); and (iii) deposition testimony from Mr. Kendall, (ECF No. 36, PageID #648).  (ECF No. 39, PageID #1320).  There are several issues with the evidence cited by TB Farms.  First, setting aside whether TB Farms's own interrogatory responses could be considered admissible evidence, the responses are merely statements that there was damage to the Driveway, and they only provide conclusory statements that Columbia's "unauthorized use" caused that damage.  (ECF No. 39-7, PageID #1401).  Second, the estimate and invoices again provide evidence of repairs done to the Driveway, but they do not provide evidence to establish that Columbia was: (i) using the Driveway in a manner inconsistent with permission from Mr. Novak or authorization provided under the FERC

29

Order; or (ii) the damage that was repaired was caused by Columbia's unauthorized conduct.  (ECF No. 39-7, PageID #1418–19, 1426).  Finally, the cited portion of Mr. Kendall's deposition merely establishes that the Driveway was not the original access road for service, which is unrelated to whether Columbia engaged in unauthorized use of the Driveway.  (ECF No. 36, PageID #648).

With that said, there is deposition testimony from both Mr. Kendall and Mr. Novak that employees/agents of Columbia used the portions of the Driveway not contemplated in the FERC approved plan (*i.e.*, outside the portions that intersect with the temporary access road, TAR-005) during the plugging operations.  (ECF No. 36, PageID #673–64, 690–97; ECF No. 38, PageID #1155–57).  There are photographs referenced during the testimony of Mr. Kendall, and provided on the record, which appear to demonstrate that Columbia used the Driveway outside the scope of the FERC approved plan.  (ECF No. 36-10, PageID #944; ECF No. 36-14; ECF No. 36-15).  The parties have presented no arguments as to whether the above evidence specifically exceeds the limits of the FERC approved plan, or even if it did, whether it is an unreasonable or unnecessary use of the Leasehold for plugging operations.  In addition, neither side has presented evidence or any specific argument as to whether the staging area used by Columbia during plugging operations was outside the FERC approved plan or was otherwise unnecessary or unreasonable.  As such, there is an issue of material fact as to whether Columbia's use of the Driveway and staging area constituted a breach of contract through unauthorized use or trespass.

> 2. *Jurisdiction over Determination of Compliance with FERC Approved Plan*

Columbia argues that the Court lacks jurisdiction to address and determine whether its plugging operations (which included use of the Driveway and the staging area) exceeded the scope of its FERC authorization because FERC has exclusive authority over compliance.  (ECF No. 40, PageID #1448; ECF No. 43, PageID #1609).  TB Farms does not address this jurisdictional

30

argument in its briefing. Regardless, the Court finds that it has jurisdiction to address whether

Columbia's plugging operations exceeded the scope of the FERC Order and certificate.

Columbia is essentially arguing that TB Farm's unauthorized use claims (breach of contract

and trespass) are preempted by the Natural Gas Act ("NGA") and its grant of authority to FERC.

Because Columbia simply states that determining whether its actions exceed the scope of FERC

authorization is outside the Court's subject matter jurisdiction, there is no argument as to whether

TB Farm's breach of contract and trespass claims are subject to express or implied preemption.

As explained by the Sixth Circuit:

> Federal law can preempt state law expressly or impliedly. *State Farm Bank, FSB v. Reardon*, 539 F.3d 336, 341 (6th Cir. 2008). Express preemption occurs when a federal statute or regulation explicitly indicates that it is preempting "a specific type of state law." *Id.* at 341–42. Implied preemption, on the other hand, comes "in one of two forms: field or conflict." *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 65 F.4th 851, 859 (6th Cir. 2023). "Regardless of the type of preemption at issue, this court's duty is to determine whether state regulation is consistent with the structure and purpose of applicable federal law." *State Farm Bank*, 539 F.3d at 342 (quotation omitted).

*Mich. First Credit Union v. T-Mobile USA, Inc.*, 108 F.4th 421, 430 (6th Cir. 2024). The party

asserting federal preemption bears the burden of proof. *Brown v. Earthboard Sports USA, Inc.*,

481 F.3d 901, 912 (6th Cir. 2007).

The NGA contains no express provision or clause preempting state law. *Nw. Cent. Pipeline*

*Corp. v. State Corp. Comm'n of Kansas*, 489 U.S. 493, 509, 109 S. Ct. 1262, 1273, 103 L. Ed. 2d

509 (1989); *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299, 108 S. Ct. 1145, 1150, 99 L.

Ed. 2d 316 (1988); *W. States Wholesale Nat. Gas Antitrust Litig. v. Oneok, Inc.*, 633 F. Supp. 2d

1151, 1162 (D. Nev. 2007); *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333,

350 (3d Cir. 2001) ("Because Congress failed to describe explicitly the extent to which the NGA

preempts state regulation of natural gas facilities, the first of the aforementioned circumstances

(express preemption) does not apply.").  This leaves either form of implied preemption: field or

conflict.  "Field preemption occurs 'where the scheme of federal regulation is so pervasive as to

make reasonable the inference that Congress left no room for the States to supplement it.'"

*Matthews v. Centrus Energy Corp.*, 15 F.4th 714, 720 (6th Cir. 2021) (quoting *Gade v. Nat'l Solid*

*Wastes Mgmt. Ass'n*, 505 U.S. 88, 98, 112 S. Ct. 2374, 120 L. Ed. 2d 73 (1992)); *Richardson v.*

*Schafer (In re Schafer)*, 689 F.3d 601, 614 (6th Cir. 2012).

Columbia previously raised field preemption by the NGA as an affirmative defense in a

case before the Northern District of Ohio involving plaintiff landowners asserting state-law tort

claims (*e.g.*, trespass) against it, and the district court rejected the argument.  *See generally Baatz*

*v. Columbia Gas Transmission, LLC*, No. 1:14-cv-505, 2016 U.S. Dist. LEXIS 200221, at *11–18

(N.D. Ohio Dec. 22, 2016).  The *Baatz* court provided a thorough analysis of field preemption in

the context of the NGA, which the Court now adopts:

> Similar to antitrust and blue sky laws that the Supreme Court held are not field
> preempted by the NGA, the common law tort claims in this case also arise from
> well-established state power with broad applicability.  In a related setting, the
> Supreme Court expressly recognized the "states' traditional authority to provide
> tort remedies to its citizens."  *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248,
> 104 S. Ct. 615, 621, 78 L. Ed. 2d 443 (1984).  In *Silkwood*, the Supreme Court
> found that although the Nuclear Regulatory Commission regulated nuclear safety,
> common law tort claims were not preempted by the Atomic Energy Act. Common
> law tort laws were not established to regulate natural-gas companies but all
> individuals and businesses in all settings.  Such laws arise from a state's traditional
> authority.

> Moreover, there is a presumption against pre-emption, particularly in fields in
> which state laws have traditionally operated.  *See Wyeth v. Levine*, 555 U.S. 555,
> 565, 129 S. Ct. 1187, 1194–95, 173 L. Ed. 2d 51 (2009).

> "[T]he purpose of Congress is the ultimate touchstone in every pre-emption
> case."  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S. Ct. 2240, 135
> L.Ed.2d 700 (1996) (internal quotation marks omitted); see *Retail Clerks v.*
> *Schermerhorn*, 375 U.S. 96, 103, 84 S. Ct. 219, 11 L.Ed.2d 179 (1963).
> Second, "[i]n all pre-emption cases, and particularly in those in which
> Congress has 'legislated ... in a field which the States have traditionally

occupied,' . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Lohr*, 518 U.S., at 485, 116 S. Ct. 2240 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947)).

*Id.* Congress did not express a clear intent to displace state tort laws when it enacted the NGA. Rather, as the Supreme Court reaffirmed in *Oneok*, the NGA "was drawn with meticulous regard for the continued exercise of state power, not to handicap or dilute it in any way." 135 S. Ct. at 1599. The Supreme Court has said that where "coordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one." *New York State Dept. of Social Servs. v. Dublino*, 413 U.S. 405, 421, 93 S. Ct. 2507, 37 L.Ed.2d 688 (1973).

The unreported Sixth Circuit decision in *Bowman v. Columbia Gas Transmission Corp.*, 850 F.2d 692, at *1, 1988 WL 68890 (6th Cir. 1988) is also instructive on this issue. In *Bowman*, the Sixth Circuit upheld an award of punitive damages for trespass in a case alleging similar facts, finding that the actual malice standard for punitive damages was demonstrated where Columbia willfully concealed its natural gas storage on the plaintiff's property without compensation for twenty years. Although the *Bowman* majority declined to reach the issue of preemption under the NGA, concluding that the issue had not been preserved for appellate review, the Sixth Circuit found the requirement that actual malice be demonstrated was "easily satisfied." Additionally, in a concurring opinion, Judge Ryan stated:

> Columbia's motion for partial summary judgment was based on the theory that Maxine Bowman's sole recourse was an action for inverse condemnation, and that she was, therefore, precluded from pursuing her state law trespass claim. The value to Columbia of such limitation is that punitive damages, permissible in a trespass claim under Ohio law, are not available in an inverse condemnation action under federal law. The district court, as a matter of law, correctly rejected this theory.

850 F.2d 692, *Id.* at *3.

*Baatz*, 2016 U.S. Dist. LEXIS 200221, at *15–18.

Other federal courts addressing this issue have found that the NGA does not create complete or field preemption over state-law claims.[8]  *See, e.g., Brackett v. Colum. Gulf*

---

[8] Although over circuits have recognized a narrow difference between complete and field preemption, *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 948–49 (9th Cir. 2014) (collecting cases), the Sixth Circuit appears to conflate the two terms and generally treat them as the same, *see, e.g, Miller v. Bruenger*, 949 F.3d 986, 994–95 (6th Cir. 2020); *Moore v. Highlands Hosp. Corp.*, No. 11-131-ART, 2011 U.S. Dist. LEXIS 133211, at

*Transmission, LLC*, No. 1:20-cv-168, 2024 U.S. Dist. LEXIS 113454, at *9 (W.D. Ky. June 27, 2024) (finding the NGA did not preempt the plaintiff's state law tort claims); *Saale Fam. L.P. v. Spire STL Pipeline LLC*, 425 F. Supp. 3d 1082, 1092–93 (E.D. Mo. 2019) (collecting cases); *Am. Energy Corp. v. Tex. E. Transmission, LP*, 701 F. Supp. 2d 921, 931 (S.D. Ohio 2010) (denying a motion to dismiss based on preemption because "neither the PSA, nor the NGA, prevents claims based on state contract, tort, or property law"); *W. States Wholesale Nat. Gas Antitrust Litig. v. Reliant Energy, Inc.*, 346 F. Supp. 2d 1123, 1131–32 (D. Nev. 2004) ("In enacting the NGA, Congress did not intend to preempt all state action.").

This leaves conflict preemption, which occurs when "it is impossible for a private party to comply with both state and federal law or if the state law is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Dayton Power & Light Co. v. FERC*, 126 F.4th 1107, 1127 (6th Cir. 2025) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73, 120 S. Ct. 2288, 147 L. Ed. 2d 352 (2000)) (internal quotation marks omitted); *In re Schafer*, 689 F.3d at 614 (citing *R.R. Ventures, Inc. v. Surface Transp. Bd.*, 299 F.3d 523, 561 (2002)). It is not impossible for Columbia to comply with both the NGA/FERC regulations and Ohio breach of contract and trespass laws—particularly when there would only be a breach of contract or trespass if Columbia exceeded the scope of the FERC certificate/approved plan. Thus, the Court must determine whether the instant breach of contract and trespass claims either stand as an obstacle to, or frustrate the purpose of, the NGA. To do so, the Court must consider whether these Ohio tort claims prevent the accomplishment of the NGA's purposes or directly interfere with the operations of FERC. *See Dayton Power & Light Co.*, 126 F.4th at 1128. The Court finds that the instant claims do not conflict with or serve as an obstacle to the NGA or FERC regulations.

---

*6–7 (E.D. Ky. Nov. 17, 2011); *Her Majesty the Queen in Right of Province of Ontario v. City of Detroit*, 874 F.2d 332, 342 (6th Cir. 1989).

Under the NGA, a natural gas company cannot abandon any portion of its facilities without first obtaining a certificate of public convenience and necessity from FERC.  *See* 15 U.S.C. §§ 717f(b)–(c), 717w; 42 U.S.C. § 7172(a)(1)(D); 18 C.F.R. § 157.216.  FERC has the "exclusive authority" to approve or deny certificate applications; challenges to that decision require an application for hearing before FERC before a party can appeal the decision to a United States Court of Appeals, which has exclusive jurisdiction to review the order. 15 U.S.C. §§ 717b(e), 717r(a)-(b). A party may not bring claims against the natural gas company in a state court or a federal district court that amount to a collateral attack on a FERC certificate or order.  *See Am. Energy Corp. v. Rockies Express Pipeline LLC*, 622 F.3d 602, 605 (6th Cir. 2010).

Columbia cites *Am. Energy Corp.* in support of its assertion that the Court lacks jurisdiction to review whether Columbia exceeded the scope of the FERC certificate/approved plan.  (ECF No. 40, PageID #1448; ECF No. 43, PageID #1609).  But the Court finds that the instant claims do not amount to either a direct or collateral challenge to the FERC Order, certificate, and approved plan.  TB Farms is instead seeking damages for conduct taken by Columbia on the Leasehold that *exceeds* FERC's approval.

The Court also finds the main case that Columbia relies on—*Waldock v. Rover Pipeline, LLC*, 2020-Ohio-3307 (Ohio Ct. App. 2020)—to be inapposite.  (ECF No. 40, PageID #1448; ECF No. 43, PageID #1609).  In *Waldock*, the Ohio Court of Appeals determined that the appellants' claims for trespass and nuisance were properly dismissed and the trial court lacked jurisdiction because the resolution of those claims turned on whether there was compliance with a FERC certificate and FERC has exclusive authority to determine compliance with the terms of a certificate.  2020-Ohio-3307, ¶¶ 40–43.  First, that Court notes that *Waldock* is not binding authority on this Court.  Second, while the trespass and breach of contract claims here also turn on

35

whether Columbia complied with the terms of the FERC certificate/approved plan, the Court does not agree that FERC has exclusive authority to determine whether specific conduct exceeds the FERC approved plan.  The *Waldock* court relies on a Northern District of New Hampshire case as support, stating:

> [Federal courts] also recognize that in addition to setting conditions for issuing a certificate, FERC is also charged with policing compliance with the certificates it issues.  The court in *Portland Natural Gas Transmission Sys. v. 4.83 Acres of Land*, 26 F.Supp.2d 332, 339 (D.N.H.1998) explained:
>
> The relevant statute and regulations place the power to police compliance squarely upon FERC. FERC's authority for imposing such conditions is provided in 15 U.S.C. § 717f(e): "The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require."  Section 717m authorizes FERC to investigate violations of provisions of FERC's orders, see 15 U.S.C. § 717m(a), and FERC regulations specify procedures for such investigations, see 18 C.F.R. §§ 1b.1—.20.  In accordance with 18 C.F.R. § 1b.8, any person may request that FERC institute an investigation. FERC can bring an action in district court to enforce its orders. See 15 U.S.C. § 717s(a).

*Id.* ¶ 38.

Although the relevant regulations certainly provide FERC with the authority to investigate violations of FERC orders, nothing in the regulatory language or the statutory scheme preclude state or federal courts from determining, in the first instance, whether specific conduct exceeded a FERC certificate or order.  The Court recognizes that there might be some conflict preemption issues if TB Farms were seeking to enforce the FERC approved plan through injunctive relief or specific performance.  But TB Farms is solely seeking damages for non-compliant conduct, something that FERC is not authorized to grant or determine.  The *Waldock* court stated:

> Appellants may be entitled to damages if, and only if, FERC determines that Rover violated the FERC certificate and related documents by taking the actions that appellants allege in the complaint.  Moreover, it would be up to FERC to determine whether and how appellants are to be "compensated" for such damages, as provided in the FERC documents.

2020-Ohio-3307, ¶ 43.  But FERC itself has directly refuted this conclusion, stating that "the *Waldock* court's statement that it is up to the Commission to determine compensation for damages is unsupported and inaccurate." *Midship Pipeline Co., LLC*, 175 F.E.R.C. P61,145, 61932, 2021 FERC LEXIS 716, *16 (May 20, 2021).  The Sixth Circuit has also recognized that the NGA does not provide FERC with jurisdiction or authorization to award damages.  *Am. Energy Corp.*, 622 F.3d at 606 (citing 15 U.S.C. § 717f);[9] *see also* C*oastal Oil & Gas Corp. v. Fed. Energy Regul. Com.*, 782 F.2d 1249, 1253 (5th Cir. 1986) ("It is well-settled that the Natural Gas Act does not give the Commission the authority to impose civil penalties.").  It does not follow that claims seeking damages for conduct outside that authorized under a FERC certificate or order are preempted by the NGA.

The final case cited by Columbia, *Millennium Pipeline Co. v. Certain Perm. & Temp. Easements*, is similarly unavailing as that case involved landowners seeking to challenge a takings claim related to an easement.  777 F. Supp. 2d 475, 477–78, 481 (W.D.N.Y. 2011).  Eminent domain powers under the NGA are not at issue here, with a district court's role in proceedings concerning takings issues explicitly proscribed.  *See* 15 U.S.C. §§ 717r(a)–(b); *USG PIPELINE Co. v. 1.74 ACRES*, 1 F. Supp. 2d 816, 821 (E.D. Tenn. 1998) (quoting *Tenn. Gas Pipeline Co. v. 104 Acres of Land*, 749 F. Supp. 427, 430 (D.R.I. 1990)).

Finally, the Court has been unable to locate any FERC decisions where the Commission has made a determination as to damages for violations of a FERC certificate.  In fact, FERC has consistently declined to address issues of damages related to trespass or breach of contract claims, citing its lack of authority and stating such issues should be addressed in the appropriate state or

---

[9] The Sixth Circuit held that dismissal of the plaintiff's claim for money damages for conversion against the pipeline company was proper because those damages could be compensated through condemnation proceedings, an issue not presented in this case. *See Am. Energy Corp.*, 622 F.3d at 606–07.

federal court.  *See, e.g.*, *Smith v. Portland Nat. Gas Transmission Sys.*, 91 F.E.R.C. P61,231, 61842, 2000 FERC LEXIS 1100, *4 (June 1, 2000) ("[T]he Smiths must address the issue of compensation for these easement violations in the appropriate state court, where they can seek to establish that they were inadequately compensated for PNGTS's easement rights or that they are entitled to damages for trespass resulting from the spill onto their land.  Accordingly, the Smiths' request for rehearing on this issue is denied."); *Id.* at *7 ("While the Commission is committed to ensuring compliance with all conditions it imposes on certificates, the Commission has no authority to issue civil penalties for violations of orders issued under the Natural Gas Act. Therefore, we will deny rehearing on this issue."); *CAlifornians for Renewable Energy, Inc., (CARE) v. Williams Nw. Pipeline*, 133 F.E.R.C. P61,194, 61976, 2010 FERC LEXIS 2174, *23–24 (Dec. 3, 2010) (determining that FERC had no jurisdiction over a dispute over an easement agreement because "[i]nterpretation of such a property contract is a matter for a court of appropriate jurisdiction, not for the Commission, which possesses no jurisdiction over, or expertise in, such matters. Moreover, nothing in the NGA gives the Commission the authority to impose damages"); *Chestnut Ridge Storage LLC*, 128 F.E.R.C. P61,210, 61970, 2009 FERC LEXIS 1788, *14 (Aug. 31, 2009) (stating that court would the appropriate forum for a trespass claim against a company constructing a project for natural gas storage); *Fla. Southeast Connection, LLC*, 154 F.E.R.C. P61,080, 61482, 2016 FERC LEXIS 138, *46 ("[Q]uestions regarding damages incurred during construction are for a court of appropriate jurisdiction to adjudicate.").  Given the above analysis, the Court finds that the instant unauthorized use claims are not preempted by the NGA and the Court maintains jurisdiction to determine whether Columbia's actions exceeded the scope of the FERC approved plan.

3.      *Summary Judgment on Unauthorized Use Damages*

In its motion for summary judgment, Columbia does not make any arguments concerning damages or request summary judgment in its favor on the issue of damages.  (*See* ECF No. 35-1). By contrast, TB Farms argues that it is entitled to summary judgment on its unauthorized use claims (breach of contract and trespass) and requests a corresponding damages award of $45,167.54, plus interest.  (ECF No. 39, PageID #1327–28).  TB Farms contends that it incurred costs related to unauthorized use during the plugging operation for: (i) repairing the Driveway and remediation of damage to the Leasehold surface caused by use outside the authorized easement area, at the cost of $16,479.54; and (ii) replacing a damaged evergreen tree area, at the cost of $28,688.00.  (*Id.* at PageID #1327).  In opposition, Columbia raises three, separate arguments as to why TB Farms is not entitled to damages for its unauthorized use claims: (i) the Andrews Lease only obligates Columbia to pay for damages to growing crops and no other property damages; (ii) TB Farms caused its own damages by preventing remediation efforts by Columbia; and (iii) TB Farms has failed to present evidence to establish that Columbia caused all the claimed damages. (ECF No.  40, PageID #1449–54).  The Court will address Columbia's arguments in turn.

a.      The Andrews Lease limits damages

Columbia argues that TB Farms is only entitled to damages to growing crops as a result of its plugging operations because the Andrews Lease explicitly disclaims all other damages to the Leasehold, including to trees or other portions of the Leasehold.  (ECF No. 40, PageID #1449–50). Columbia argues that the Sixth Circuit and Ohio courts agree, citing *Andrews v. Columbia Transmission Corp.*, 544 F.3d 618 (6th Cir. 2008) and *Voisard v. Marathon Ashland Pipe Line, L.L.C.*, 2006-Ohio-6926 (Ohio Ct. App. 2006).  (*Id.*).  TB Farms argues that there is no express

provision disclaiming all other damages and the provision for paying damages to crops is complimentary.  (ECF No. 42, PageID #1591–92).

Columbia refers to the following provision of the Andrews Lease: "Lessee shall bury, when so requested by Lessor, all pipe lines used to conduct gas or oil off the premises and shall pay all damage to growing crops caused by operation under this lease."  (ECF No. 37-2, PageID #1040).  The Court finds that the caselaw cited by Columbia supports its position that, under the Andrews Lease, it is not obligated to pay for damages to the Leasehold caused by its operations outside of damage to growing crops.  In a recent decision, the Southern District of Ohio addressed this exact issue, providing the following analysis on the relevant caselaw:

> In *Voisard v. Marathon Ashland Pipe Line, L.L.C.*, 2006-Ohio-6926, ¶ 2 (Ohio Ct. App), defendant had a contractual easement to lay, operate, and maintain a pipeline on plaintiff's property and to use the premises in a manner "necessary" to exercising its rights. The contract, entered into in 1952, provided that defendant would pay the landowner "any damages caused by it to growing crops or fences by the laying, erecting, maintaining, operating or removing of said pipe lines."  *Id.* (emphasis omitted).  Defendant removed trees from the property so that it could conduct aerial inspections of the pipeline, and plaintiff sued for damages for breach of the easement.  The court rejected plaintiff's claims and granted summary judgment to defendant.  The court first found that plaintiff had failed to produce any evidence that the removal of trees was not necessary to defendant's exercise of rights.  The court further found that "giving the damages clause its plain and ordinary meaning," "the parties did not intend to include damages for the cutting of trees or timber." *Id.* ¶ 10.  The court examined the dictionary definition of "crops" and found that the trees at issue, which were not fruit-bearing trees, did not meet the definition. Thus, trees were not among the items for which defendant owed a duty to compensate plaintiff.  *See id.*
>
> Similarly, in *Andrews v. Columbia Transmission Corp.*, 544 F.3d 618, 621 (6th Cir. 2008), the defendant had a contractual easement dating from 1947 to lay, operate, and maintain a pipe on plaintiffs' land in Ohio. Defendant was to "pay any damages which may arise to crops and fences from the laying, maintaining, operating and final removal of said pipe line."  *Id.*  Defendant notified plaintiffs of its intent to clear a stand of pine trees in order to access and inspect the pipeline, and plaintiffs sued to enjoin the removal of the trees and, in the alternative, for damages.  After a bench trial in which the district court determined that clearing the trees was "necessary and convenient" to defendant's exercise of rights, the court rejected plaintiffs' claim for compensation, and the Sixth Circuit upheld that decision.  *Id* at

622.  Relying on *Voisard*, the Sixth Circuit held: "Here, the agreement provided for damages to crops and fences, not trees.  The plain and ordinary meaning of these words is clear." *Id.* at 632.

*Reed*, 2025 U.S. Dist. LEXIS 97839, at *25–26.

*Reed* involved a nearly identical lease, and the same provision language, present in this case.  (*Compare* ECF No. 37-2, PageID #1040, *with Reed*, 2025 U.S. Dist. LEXIS 97839, at *24, and Def.'s Answer, Ex. A, ECF No. 7-1, PageID #113, *Reed v. Columbia Trans. LLC*, Case No. 2:22-cv-3417 (S.D. Ohio Sept. 14, 2022)).  The *Reed* court found that the landowner plaintiffs were not entitled to compensation from Columbia for alleged damages to trees, other vegetation, and the land's surface under the plain language of the relevant lease agreement.  *Reed*, 2025 U.S. Dist. LEXIS 97839, at *26–27.  In light of Sixth Circuit precedent, the Court similarly finds that the plain language of the Andrews Lease does not entitle TB Farms to compensation for alleged damages to the evergreen trees, which do not meet the definition of "crops", or the Leasehold's surface, with an important caveat—this discount of damages applies only to actions taken within the scope of authority granted under the Andrews Lease.  Accordingly, Columbia may still be liable for damages caused by Columbia during plugging operations if they were outside the scope of the FERC approved plan *and* otherwise unreasonable—*i.e.*, outside the authority granted under the Andrews Lease.  Because the Court has found there is an issue of material as to the issue of unauthorized use, TB Farms's claim for damages is not precluded by the damages provision of the Andrews Lease.

b.      TB Farms caused its own damages – block of remediation efforts

Columbia argues that TB Farms cannot recover damages allegedly caused during plugging operations because TB Farms refused to allow Columbia to perform any remediation, which also constitutes a failure to mitigate.  (ECF No. 40, PageID #1450–52).  TB Farms argues that

Columbia's plan to delay remediation work from February 2022 to August 2022 based on winter weather was unreasonable.  (ECF No. 42, PageID #1592).  Columbia also argues that TB Farms actions in hindering and blocking any remediation efforts by Columbia constitute a breach of contract because they prevented completion of the FERC approved plan.  (ECF No. 40, PageID #1451).

To the extent that Columbia engaged in unauthorized use of the Leasehold during plugging operations, the Court finds that TB Farms blocking remediation efforts as to damages related to such unauthorized use would not constitute a breach of contract because those damages and actions, if any, were outside the scope of the Andrews Lease.  The Court finds that Columbia's failure to mitigate defense is also unavailing with respect to damages caused by alleged unauthorized use.  Columbia argues that any alleged damages could have been mitigated if it was allowed to finish remediation.  This argument is misplaced because TB Farms was under no obligation to allow Columbia to remediate damage based on conduct outside its authorized use of the Leasehold.  That said, Columbia's claim that it could have remediated alleged damages for between $5,000 and $6,000 does go to whether the $45,167.54 in damages claimed by TB Farms is reasonable and supportable and is appropriate to raise in future proceedings.

c.    Insufficient evidence to establish damages

Finally, Columbia argues that there are issues of fact that preclude an entry of summary judgment as to damages because TB Farms cannot demonstrate that its claimed damages for restoration of the Leasehold are reasonable or were proximately caused by Columbia.  (ECF No. 40, PageID #1452–54).  With respect to the alleged damages to the Driveway, Columbia argues that the invoices relied on by TB Farms are inadmissible hearsay and should not be considered for purposes of summary judgment.  (*Id.* at PageID #1439–40).  It argues that the

invoices are not properly authenticated and cannot satisfy the business records exception because: (i) no certification was submitted by a custodian of the records; (ii) most of the invoices were not made at or near the time of the repairs; and (iii) the invoices are unreliable.  (*Id.* at PageID #1438–39).  TB Farms counters that the Court should not exclude consideration of the invoices because: (i) Mr. Novak authenticated them during his deposition; (ii) even if not admissible in their current form, the content of the invoices would be admissible through live testimony during the trial; and (iii) the invoices are admissible under the residual hearsay exception.  (ECF No. 42, PageID #1582–84).  The Court refrains from ultimately deciding whether the invoices would be admissible at trial and whether they can be properly considered at the summary judgment phase, because the Court finds there are issues of material fact with regard to TB Farms's claimed damages whether the invoices are considered or excluded.[10]

As argued by Columbia, TB Farms has not provided sufficient evidence to demonstrate that there is no issue of material fact as to the amount of damages that Columbia is responsible for with respect to repairing the Driveway.  There is evidence that semitrucks with trailers used the Driveway for "hauling corn in and out" for TB Farms during the same times that Columbia was engaged in plugging activities.  (ECF No. 36, PageID #726).  Moreover, Mr. Novak testified that over the five to six years between the construction of the Driveway and the plugging operations for Well 7779, he had to repair the Driveway once a year.  (ECF No. 38, PageID #1167–69).  For the alleged damages to the evergreen tree farm, there is evidence that calls into question the reasonableness of the $26,668.00 estimate provided by TB Farms.  This evidence includes: (i) Mr. Novak's own testimony that most of the trees had died by 2019 or 2020 and his inability to confirm if any trees were alive when the plugging operation began, (ECF No. 38, PageID #1148); (ii) Mr.

---

[10] If Columbia wishes to exclude the invoices as evidence during the trial, it may file a motion in limine at the appropriate time.

Novak's testimony that he could not see any evergreen trees in a picture of the tree farm area around the time of the plugging operations, (*id.* at PageID #1150); and (iii) Mr. Kendall's testimony that the alleged tree farm area was covered in weeds and the evergreen trees were absent when plugging operations commenced, (ECF No. 36, PageID #727).

In summation, the Court finds that damages related to the instant unauthorized use claims, should Columbia ultimately be found liable, are limited to damages resulting from conduct that both exceeded the scope of the FERC approved plan and is found unreasonable for purposes of the plugging operations.  Furthermore, there are issues of material fact as to the amount of any damages TB Farms may have suffered as a result of any alleged unauthorized use.  As a result, the Court **DENIES** summary judgment in favor of either party on liability and damages as to the breach of contract and trespass claims in Counts VI and VIII that are based on actions in excess of authorized use of the Leasehold during plugging operations.

### F.     Promissory Estoppel – Driveway (Count VII)

For Count VII, Columbia first argues that it is entitled to summary judgment on TB Farms's promissory estoppel claim related to the use of the Driveway because that claim is barred by the statute of frauds.  (ECF No. 35-1, PageID #319).  TB Farms responds that the statute of frauds does not apply because Columbia's promise to refrain from using the Driveway did not create or convey an interest in land.  (ECF No. 41, PageID #1577).  Columbia replies that TB Farms has cited no support for its conclusory argument and argues that the promise to not use the Driveway was a modification of the right-of-way access easement granted under the Andrews Lease; therefore, the promise involves an interest in land and the promissory estoppel claim is barred by the statute of frauds.  (ECF No. 43, PageID #1613).

Columbia's statute of frauds argument is partially correct and partially incorrect.  The Court agrees with Columbia that the alleged oral agreement is a modification of the access easement granted under the Andrews Lease.  Under Ohio law, a contract creating an interest in land and easements can be modified only if the modification itself also conforms with the statute of frauds.  *See Johnson v. New Direction IRA F.B.O King C. Lam*, 2018-Ohio-4608, ¶ 34 (Ohio Ct. App. 2018) ("An easement is an 'interest in land' pursuant to the statute of frauds that must be in writing, and signed by the parties or their agents authorized to grant the interest.  A parol agreement does not modify an easement agreement because it would run afoul of the statute of frauds." (internal citations omitted)); *Vieland v. Commodore Realty Assocs.*, 1996 Ohio App. LEXIS 4559, *8–9 (Ohio Ct. App. 1996); *Bahner's Auto Parts v. Bahner*, 1998 Ohio App. LEXIS 3453, *28 (Ohio Ct. App. 1998); *see also Sutherland v. Fox*, 2005-Ohio-1786, ¶¶ 23–25 (Ohio App. 2005) ("Under R.C. 1335.04 and 1335.05, any modifications to the original oil and gas lease agreement must be in writing.").  Because the alleged oral promise was never formalized in a written agreement, it does not comport with the statute of frauds and is therefore unenforceable.  *See Olympic Holding Co., L.L.C. v. ACE Ltd.*, 2009-Ohio-2057, ¶ 32, 122 Ohio St. 3d 89, 94, 909 N.E.2d 93, 99 (Ohio 2009) ("Agreements that do not comply with the statute of frauds are unenforceable.").

That said, while a party may not sustain a promissory estoppel claim based on an oral promise that is barred by the statute of frauds, they may still purse a claim for promissory estoppel to recover reliance damages.  *Lemmon v. Ayres*, 517 F. App'x 424, 428 (6th Cir. 2013) (citing *Olympic Holding Co.*, 909 N.E.2d at 100–03; and *ZBS Indus., Inc. v. Anthony Cocca Videoland, Inc.*, 93 Ohio App. 3d 101, 637 N.E.2d 956, 960 (Ohio Ct. App. 1994)) ("[A] plaintiff may still pursue a claim for detrimental-reliance damages under a promissory estoppel theory despite the

45

fact that the statute of frauds bars specific performance of the oral promise."); *Ponder v. Bank of Am., N.A.*, No. 1:10-cv-81, 2011 U.S. Dist. LEXIS 154581, at *7 (S.D. Ohio Mar. 8, 2011) ("Plaintiffs are using the doctrine of promissory estoppel as an equitable remedy to recover reliance damages based on Defendants' representations.  Plaintiffs are entitled to do so under Ohio law." (internal citations omitted)).  Because TB Farms asserts a separate, alternative claim for reliance damages based on promissory estoppel, the statute of frauds does not bar this claim.

Columbia also argues that Count VII fails on the merits because TB Farms cannot establish detrimental alliance, citing Mr. Novaks's testimony that he "do[es]n't know if [he] would have done anything differently" if Columbia had not promised to use the Driveway.  (ECF No. 35-1, PageID #320–21).  TB Farms responds that this testimony does not demonstrate a lack of detrimental reliance and only demonstrates, at best, that there is a genuine issue of material fact.  (ECF No. 41, PageID #1577–58 ("Not knowing *today* what he would have done differently *then* does not entitle Columbia to summary judgment in its favor." (emphasis in original)).  Columbia replies that TB Farms has conceded that there was no detrimental reliance because his own statements do not demonstrate that, but for Columbia's alleged promise, TB Farms would have done anything different.  (ECF No. 43, PageID #1613–14).

The Court agrees with Columbia.  To establish a claim of promissory estoppel under Ohio law, a plaintiff must prove: "[1] a promise, clear and unambiguous in its terms; [2] reliance [on the promise] by the party to whom the promise is made; [3] that the reliance was reasonable and foreseeable; and [4] that the party claiming estoppel was injured by the reliance."  *Andersons Inv.*, 348 F.3d at 503.  In other words, to sustain a promissory estoppel claim, a plaintiff must establish detrimental reliance.  *Cline v. Cath. Diocese*, 206 F.3d 651, 669 (6th Cir. 1999) (quoting *Karnes v. Doctors Hosp.*, 51 Ohio St. 3d 139, 142, 555 N.E.2d 280 (Ohio 1990)); *Bernard v. Rockwell*

46

*Int'l Corp.*, 869 F.2d 928, 933 (6th Cir. 1989) ("Promissory estoppel theory requires detrimental reliance.").

The amended complaint alleges that TB Farms proposed splitting the cost of constructing the Driveway, Columbia rejected that proposal, but promised to not use the Driveway, and TB Farms constructed the Driveway at its own cost in reliance on Columbia's promise. (ECF No. 21, ¶¶ 69–71). The sole evidence provided by TB Farms to establish detrimental reliance is testimony from Mr. Novak's deposition that he spoke with a land agent for Columbia around 2015 or 2016 about contributing to the cost of constructing the Driveway, who assured Mr. Novak that "his guys would never use [the Driveway], and if they were ever to work on the well, they would install their own driveway." (ECF No. 39, PageID #1320 (citing ECF No. 38, PageID #1125–27)). First, setting aside whether such a promise is clear and unambiguous or whether such reliance was reasonable, this evidence does not establish that Mr. Novak constructed the Driveway because of or in reliance on the alleged promise. There is no representation or evidence that Mr. Novak would not have constructed the Driveway if Columbia or its agents never represented that they would not use the Driveway. Instead, this evidence merely establishes that Mr. Novak wished to share the construction cost in exchange for Columbia being granted permission to use the Driveway. In fact, Mr. Novak's own testimony establishes that there was no reliance on the alleged promise not to use the Driveway in making the decision the construct the Driveway. When asked if he would have done anything differently with respect to constructing the Driveway, Mr. Novak testified "I don't know if I would have done anything differently." (ECF No. 38, PageID #1130). Simply put, no evidence before the Court establishes that the alleged promise induced Mr. Novak to

construct the Driveway.  Without evidence of detrimental reliance, TB Farms's promissory estoppel claim in Count VII cannot survive summary judgment.[11]

Accordingly, the Court **GRANTS** summary judgment in Columbia's favor on Count VII.

## XX.  COUNTERCLAIM

As part of its answer to the original complaint, Columbia asserted a single counterclaim for declaratory judgment against TB Farms.  (ECF No. 8, PageID #74–79).  Columbia requested a declaration that:

> a. The Lease Agreement and Supplemental Agreement encumber tax parcels 19-02-030-000-042 and 19-02-030-000-056 so long as Columbia stores natural gas beneath them.
>
> b. Plaintiff's privilege to take 300,000 cubic feet of gas free of charge from a well ceased once Columbia abandoned the well.
>
> c. Notwithstanding the well abandonment, Plaintiff would not have a privilege to use limited free gas in the dwelling located on tax parcel number 19-03-031-000-004, which is located in Lot 31 of Penfield Township, Lorain County, Ohio, namely 40300 Jones Road, Wellington, Ohio, where this parcel is not encumbered by the Lease or Supplemental Agreement, and any provision of such service has been in error.

(*Id.* at PageID #79).  Although neither party addressed or sought relief with respect to the counterclaim, the Court's resolution of the parties' cross-motions for summary judgment necessarily resolved the counterclaim because Counts I and II sought an opposite declaration in TB Farms's favor.  Accordingly, the Court **GRANTS** summary judgment in Columbia's favor as to its sole counterclaim.

---

[11] Although determination of detrimental reliance is generally a quest of fact for the jury to resolve, "[c]ourts have recognized, however, that the reliance element of a promissory estoppel claim can properly be adjudicated in summary judgment proceedings where the claimant has failed to present evidence of reliance." *Executone of Columbus, Inc. v. Inter-Tel, Inc.*, 665 F. Supp. 2d 899, 921 (S.D. Ohio 2009).

## V.      CONCLUSION

For the forgoing reasons, Plaintiff TB Farm's motion for summary judgment (ECF No. 39) is **DENIED**.  Defendant Columbia's motion for summary judgment (ECF No. 35) is **GRANTED IN PART AND DENIED IN PART**.  Summary judgment is entered in Columbia's favor on Counts I, II, III, IV, V, and VII.  Summary judgment is also entered in Columbia's favor on the breach of contract claims in Count VI based on breach of quiet enjoyment and breach of the implied covenant to restore the surface, as well as the trespass claims in Count VIII based on the Andrews Lease being terminated.  Columbia's  motion for summary judgment as to the breach of contract and trespass claims based on unauthorized use in Counts VI and VIII is **DENIED**.  Lastly, summary judgment is entered in Columbia's favor on its sole counterclaim (ECF No. 8, PageID #74–79).  Thus, the unauthorized use claims in Counts VI and VIII are the sole claims that remain pending before the Court.

**IT IS SO ORDERED.**

Date: July 14, 2025

_____
**CHARLES E. FLEMING**
**U.S. DISTRICT COURT JUDGE**

49